UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO AGUIL,<br><br>　　　　　Petitioner,<br><br>　v.<br><br>R. P. NOMAN,<br><br>　　　　　Respondent. | No. 1:21-cv-01666-JLT-SKO (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[THIRTY DAY OBJECTION DEADLINE]** |

Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is currently in state prison serving a fourteen year sentence for continuous sexual abuse of a minor under the age of fourteen and lewd and lascivious acts with a minor under the age of fourteen. Petitioner claims a violation of his constitutional rights under Miranda v. Arizona, 384 U.S. 436 (1966). As discussed below, the Court finds the claim to be without merit and recommends the petition be **DENIED.**

**I.　　PROCEDURAL HISTORY**

On October 10, 2018, a Kern County jury found Petitioner guilty of continuous sexual of a minor under the age of fourteen (Cal. Penal Code § 288.5(A)) and lewd and lascivious acts a minor under the age of fourteen (Cal. Penal Code § 288(A)). (Doc. 11-2 at 35.[1]) On December 20, 2018, the court sentenced him to a term of twelve years on the continuous sexual activity

---

[1] Unless otherwise noted, references are to ECF pagination.

count and a consecutive two-year term on the lewd and lascivious count. (Doc. 11-2 at 35.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On April 6, 2021, the appellate court affirmed the judgment. People v. Aguil, 2021 WL 1258222, at *9 (Cal. Ct. App. 2021). Petitioner filed a petition for review in the California Supreme Court. (Doc. 11-8 at 2.) On June 9, 2021, the California Supreme Court summarily denied the petition. (Doc. 11-8 at 1.)

On November 15, 2021, Petitioner filed the instant habeas petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on December 14, 2021. (Doc. 12.) Petitioner did not file a traverse.

## II.     FACTUAL BACKGROUND

The facts are derived from the appellate court's Statement of Facts in its unpublished decision[2]:

Petitioner and the victim are blood relatives. In May 2017, the victim (then age 14) told her mother that Petitioner began molesting her when she was 12 years old and he was between the ages of 18 and 19. The abuse continued past her 13th birthday, progressing to acts of oral sex and intercourse. The allegations were reported to the police on May 24, 2017.

On June 7, 2017, the police recorded a pretextual phone call made by the victim to Petitioner for the purpose of eliciting incriminating statements. The conversation was brief, and Petitioner denied having any memory of the events about which he was asked. On June 21, 2017, the police recorded another "pretext call" initiated by the victim's mother. The mother's approach was very aggressive and accusatory. Petitioner told her the victim had "come on to [him]," i.e., tried to initiate physical intimacy, but he claimed to have rejected her advances. After approximately 45 minutes of repeating such denials, Petitioner finally admitted the allegations were true.

---

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

On June 22, 2017, two police detectives made an unscheduled visit to the home of Petitioner's grandmother, where Petitioner was residing. The grandmother invited the detectives inside, and Petitioner agreed to speak with them. One of the detectives activated an audio recording device prior to entering the home. After approximately 10 minutes of questioning, Petitioner incriminated himself. He was placed under arrest a few minutes later.

Petitioner was then charged with committing a lewd act upon a child under the age of fourteen and continuous sexual abuse of a child under the age of fourteen. At trial, Petitioner unsuccessfully moved to suppress evidence of his conversation with the detectives. Aguil, 2021 WL 1258222, at *1-2.

## III.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.   Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). The petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" Shinn v. Kayer, ___ U.S. ___, ___ , 141 S.Ct. 517, 523, 2020 WL 7327827, *3 (2020) (quoting Virginia v. LeBlanc, 582 U. S. ___, ___, 137 S.Ct. 1726, 1728 (2017) (*per curiam*)). Instead, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility of fairminded disagreement*." Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 141 S.Ct. at 523, 2020 WL 7327827, *3. Congress "meant" this standard to be "difficult to meet." Richter, 562 U.S. at 102.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539

4

U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

### C. Review of Petition

Petitioner alleges his constitutional rights under Miranda were violated by the admission of Petitioner's confession to the detectives. Petitioner raised this claim on direct review in the state courts. In the last reasoned decision, the Fifth DCA denied the claim as follows:

**A. Additional Background**

The hearing on defendant's motion to suppress included testimony by defendant's grandmother and Detective Rick Wimbish of the Bakersfield Police Department. The trial court also listened to an audio recording of the interview. The following summary is derived from the witness testimony and our independent review of the recording.

On June 22, 2017, the day after the second pretext call, Detective Wimbish and his partner went to defendant's residence. They pulled up to the house in an unmarked car, arriving shortly before 11:00 a.m. The detectives were not in uniform but wore professional attire, i.e., "dress slacks, dress shirt, and a tie." Detective Wimbish wore a lanyard displaying his police identification and had a holstered firearm at his hip.

The detectives knocked on the front door and proceeded to converse with the primary occupant, defendant's grandmother. Detective Wimbish described the initial encounter: "[S]he said that [defendant] was sleeping, and she was going to go wake him up so he could speak with us. And then she came back to the door,

5

and we spoke a little bit longer about—small talk until [defendant] arrived at the door."

Detective Wimbish's partner activated the recording device during the so-called "small talk." It is evident from the recording that defendant's grandmother knew why the detectives were there and was aware of the victim's allegations. She stated, in reference to the victim's mother, "I thought he [defendant] should have told her, '... I am not coming to your house no more 'cause, uh, [the victim] is [following] me around and touching me and won't leave me alone.' And so maybe that way she [the victim's mother] would have believed him. But ... he was in special class in school for—he's not that bright. Sometimes I tell him, 'Give me the white clothes to go wash 'em.' He give me [the] color one. I said that's [color]—that's not white." [Fn.2]

> [Fn.2] In arguing the motion to suppress, the defense emphasized the fact defendant had been in special education classes in high school. However, the testimony of school personnel with knowledge of his education records established defendant had an IQ score of 93, which is within the range of "average" intelligence. Despite a learning disability in the areas of reading and writing, he graduated from Delano High School at the age of 18.

Detective Wimbish interrupted the grandmother to ask again if defendant was home. We quote the salient parts of the recording (brackets indicate discrepancies between what can be heard on the recording and what appears in a written transcript of the same): [Fn.3]

> [Fn.3] The trial court noted there were unspecified "disagreements about the transcript." For our purposes, the only material difference is the fact the grandmother can clearly be heard suggesting the detectives speak to defendant in a "bedroom." Her statement is inaccurately and incompletely transcribed as "You say you got a room." Next, someone says, "That's fine." The transcript attributes the statement to Detective Wimbish's partner, but it sounds like defendant's voice.

"DET. WIMBISH: Is Francisco ... here?

"[GRANDMOTHER]: Uh, that's him [right] there. Want to go outside or do you want to come inside?

"DET. WIMBISH: It doesn't matter ... [—]

"[GRANDMOTHER]: Oh, come on in then.

"DET. WIMBISH: [—] He can come out or whatever [—]

"[GRANDMOTHER]: [Want in or out?]

"DET. WIMBISH: [—] Whatever's more convenient for you. Is there a place we can talk privately in here?

"[DEFENDANT]: [[Unintelligible]]

"[GRANDMOTHER]: You [can go in] a room, [bedroom].
"[UNKNOWN]: That's fine.

6

> "DET. WIMBISH: [Okay, yeah, if that works for you.] [W]e appreciate it."

The detectives followed defendant to his room. Defendant said, "sorry," apparently in reference to the state of the bedroom. The conversation continued:

> "DET. WIMBISH: ... That's fine. Hopefully, we won't take too awfully long. Uh, there's my card. I'm Detective Wimbish. I'm with the Bakersfield Police Department. This is Detective Tipton and I might just sit right here if that's okay with you?
>
> "[DEFENDANT]: Sure.
>
> "DET. WIMBISH: Okay. And you're Francisco?
>
> "[DEFENDANT]: Yes.
>
> "DET. WIMBISH: Is it okay if we sit here and talk for a little bit about some stuff?
>
> "[DEFENDANT]: Yeah.
>
> "DET. WIMBISH: Okay. Appreciate you're inviting us—inviting us in ...."

Detective Wimbish asked for defendant's full name, date of birth, and other identifying information, which defendant provided. Defendant also produced his Social Security card. After reviewing the card, Detective Wimbish began what the parties agree was an interrogation. The interrogation starts at approximately six minutes and 10 seconds into the recording:

> "DET. WIMBISH: ... I'm sure you know why we're here.
>
> "[DEFENDANT]: Kind of ....
>
> "DET. WIMBISH: What do you know about why we're here today?
>
> "[DEFENDANT]: [The victim's mother and the victim] and everything. Yeah.
>
> "DET. WIMBISH: Okay. Can you tell me some more about that?"

Defendant spent approximately seven minutes providing narrative statements about his family background and interactions with the victim during the relevant time period. His statements were apparently intended to be exculpatory. The victim was portrayed as having behaved in vaguely inappropriate ways toward him, culminating in her attempt to "blackmail" defendant by threatening to falsely accuse him of molestation unless he complied with her various demands.

Detective Wimbish listened passively, sometimes asking for clarification about locations and the identities of family members. He also asked whether the victim had ever "flirted" with defendant. Defendant answered, "Kind of yeah. Like there's times but like I would just ignore it and like 'cause I didn't—I'm not tryin' to get in that kind of situation 'specially like with my family ...."

Defendant's involuntariness claim is based on what occurred after he provided the exculpatory narratives, beginning at approximately 13 minutes and 25 seconds into

7

the recording:

> "DET. WIMBISH: Okay. Well you obviously know because we're here that they've made a police report.
>
> "[DEFENDANT]: Yeah.
>
> "DET. WIMBISH: Uh, so I've sat and talked with [the victim] and—and she's basically told [me] what happened and, uh, she's basically told me that—that you forced [this] sex on her. So, my—my—my—one of my questions is you know was it you actually forcing her to do this or was it mutual? Was it consensual on both of your parts?
>
> "[DEFENDANT]: I wanna say we've never had sex, but I never forced her to do nothing.
>
> "DET. WIMBISH: Mm-hm.
>
> "[DEFENDANT]: At all.
>
> "DET. WIMBISH: So, the sex you [guys] had that was consensual then?
>
> "[DEFENDANT]: We never had sex.
>
> "DET. WIMBISH: Okay well I didn't just get this report this morning or I didn't [even] just get it yesterday. I got it about three to four weeks ago. So, I've been workin' on this for quite a while. Okay? And I've also talked to your Uncle Robert. Okay? And he told me about the conversation that you guys had. Okay? And that's all already documented in the report weeks ago the conversation you had talkin' to him about having sex with [the victim]. Okay? So, again, one of my questions is because I'm trying to determine if this was consensual sex you had with [the victim] or if it was—or if you held her down and made her do it. I [mean you're saying] she started flirting with you so I'm tryin' to determine if it was consensual sex you had with [the victim] or if you forced her to do it.
>
> "[DEFENDANT]: It was consensual.
>
> "DET. WIMBISH: It was consensual[?] And I understand that the sex you had with [the victim] was on multiple occasions[.] And she ... apparently has [some] clothes left from one of those times that there might be some DNA on. Uh, [we're] gonna find your DNA on her clothes you think?
>
> "[DEFENDANT]: I don't know.
>
> "DET. WIMBISH: Okay. So, she also says that you used a condom every time you guys had sex except for maybe once she wasn't sure. Do you think you used a condom every time you had sex with her? No? Did you use condoms sometimes with her? Yeah. Uh, and then she said during the oral sex you—you never used a condom. Is that correct? You're shaking your head yes?
>
> "[DEFENDANT]: Yes sir.
> "DET. WIMBISH: Okay. How many times do you think you had oral sex with her?

> "[DEFENDANT]: Every time I was asleep on the couch and she would come and bother me.
>
> "DET. WIMBISH: Okay. [Talking like] five ten fifteen twenty times you think or less than twenty?
>
> "[DEFENDANT]: Less Than 10.
>
> "DET. WIMBISH: Less than 10. And then how 'bout regular sexual intercourse. How many times you think that occurred?
>
> "[DEFENDANT]: [As many times as] she bothered me in the middle of the night.
>
> "DET. WIMBISH: Less than 20?
>
> "[DEFENDANT]: Less than 10."

The interrogation continued for another four minutes before defendant was placed under arrest.

The trial court found, in pertinent part: "[I]t [was] an interrogation; however, I don't think there [are] any facts that support he was in custody.... It appeared to be clearly consensual first by the grandmother and then by defendant." Defendant's statements were also found to have been voluntarily given. Accordingly, the motion to suppress was denied.

**B. *Miranda* Claim**

If a defendant is subjected to custodial interrogation without being advised pursuant to *Miranda*, statements made during the interrogation cannot be used in the prosecution's case-in-chief. (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162; *People v. Thornton* (2007) 41 Cal.4th 391, 432.) "Under *Miranda*, police officers must warn a suspect before questioning that he or she has the right to remain silent and the right to the presence of an attorney." (*People v. Case* (2018) 5 Cal.5th 1, 20.) "In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502.) "Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

In "*Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508–509.) "Interrogation consists of express questioning or of words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1224.) The fact defendant was interrogated is not in dispute. However, in the absence of custodial interrogation "*Miranda* simply does not come into play." (*People v. Mickey* (1991) 54 Cal.3d 612, 648.)
"The key question is whether, under all of the objective circumstances, a reasonable person in the suspect's position would have felt free to terminate the

9

interrogation. [Citations.] But even if a person's freedom of movement has been curtailed, an 'additional question' arises: 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.' [Citations]." (*People v. Caro* (2019) 7 Cal.5th 463, 491.) The *Miranda* case involved "incommunicado interrogation of individuals in a police-dominated atmosphere" where the suspects were "cut off from the outside world." (*Miranda, supra*, 384 U.S. at p. 445.)

"Relevant factors include the location of the questioning [citation], its duration [citation], statements made during the interview [citations], the presence or absence of physical restraints during the questioning [citation], and the release of the interviewee at the end of the questioning [citation]." (*Howes v. Fields, supra*, 565 U.S. at p. 509.) "Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory.'" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403–1404.)

There are factors weighing in favor of both defendant and the People. On the one hand, for example, Detective Wimbish made clear defendant was the subject of a criminal investigation and confronted him with evidence of his guilt. On the other hand, the questioning was brief and nonaggressive. Defendant was interrogated for less than 15 minutes, beginning when he was asked "What do you know about why we're here today?" and ending when he was told to follow the detectives to their car.

The location factor cuts both ways. In contrast to the "inherently coercive atmosphere" of a police station (*People v. Montano* (1991) 226 Cal.App.3d 914, 939; see *Berkemer v. McCarty* (1984) 468 U.S. 420, 438), a suspect "is more likely to be "'confident, indignant, or recalcitrant'" [citation] and "'more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home.'"" (*People v. Saldana* (2018) 19 Cal.App.5th 432, 456, quoting *Miranda, supra*, 384 U.S. at pp. 449–450.) If family members are nearby, "their presence [can provide] moral support." (*Miranda*, at p. 450.) However, questioning defendant in his bedroom arguably restricted his freedom of movement. Defendant emphasizes this point, but it was his grandmother who suggested they go into the bedroom. The detectives had said, "[H]e can come out[side] or ... whatever's more convenient for you."

In *People v. Linton* (2013) 56 Cal.4th 1146, the questioning of a murder suspect inside of his home was determined to be noncustodial interrogation. (*Id*. at pp. 1167–1168.) After a detective and a deputy district attorney had asked to speak with him, the appellant "invited them into his house, taking them into his bedroom." (*Id*. at p. 1167.) The appellant was not restrained, and there was "no evidence that they blocked [his] exit from the bedroom." (*Ibid*.) The appellant was questioned "for about a half-hour," and "[t]he nature of their questioning" was neither "aggressive [nor] particularly confrontational." (*Ibid*.)

Few circumstances distinguish the interrogation in this case from the one in *Linton*. Defendant's interview was shorter, which does not help his argument. The *Linton* interrogators carried no visible firearms, which is a detail weighing in defendant's favor. (*People v. Linton, supra*, 56 Cal.4th at p. 1167.) Most significantly, the *Linton* appellant was repeatedly told he was not under arrest and

10

> did not have to answer any questions. (*Ibid.*) Such assurances were not provided to defendant, but the general message was at least partially conveyed (albeit subtly) when Detective Wimbish asked, "Is it okay if we sit here and talk for a little bit about some stuff?" Defendant responded affirmatively, and the detective said he appreciated the fact defendant had invited them inside.
>
> The audio recording tips the scale in favor of the People. It shows Detective Wimbish was calm and polite, and that he deferred to defendant and his grandmother with respect to where the interview took place. As observed by the trial court, the interactions come across as entirely consensual. After spending the first half of the interview listening to defendant's narrative statements, the detective matter-of-factly disclosed what he had learned from the victim and her family. Defendant began to confess just a few moments later.
>
> "'[A]ccusatory questioning is more likely to communicate to a reasonable person in the position of the suspect[ ] that he is not free to leave' than would general and neutral investigative questions. Thus, on the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory. [Citations]." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1164.) While not entirely free of accusations, Detective Wimbish's conversation with defendant was brief, polite, courteous, and nonthreatening. Based on the totality of the circumstances, we conclude defendant's confession was made in a noncustodial setting. As such, there was no *Miranda* violation.

Aguil, 2021 WL 1258222, at *2-6.

    a.    <u>Legal Standard</u>

The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself." A suspect subject to custodial interrogation has a Fifth Amendment right to consult with an attorney, and the police must explain this right prior to questioning. <u>Miranda v. Arizona</u>, 384 U.S. 436, 469–73 (1966). In <u>Miranda</u>, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her. <u>Id</u>. at 473–74. These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations." <u>DeWeaver v. Runnels</u>, 556 F.3d 995, 1000 (9th Cir. 2009).

"Fidelity to the doctrine announced in <u>Miranda</u> requires that it be enforced strictly, but

only in those types of situations in which the concerns that powered the decision are implicated." Berkemer v. McCarty, 468 U.S. 420, 437 (1984). Although "those types of situations" may vary, they all share two essential elements: "custody and official interrogation." Illinois v. Perkins, 496 U.S. 292, 296–97 (1990).

To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (internal quotation marks omitted). The inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned. Id. at 323. The court must determine whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." United States v. Beraun–Panez, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127 (9th Cir.1987); see also United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001). The Ninth Circuit has noted the following factors to be relevant to deciding that question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Hayden, 260 F.3d at 1066 (citing Beraun–Panez, 812 F.2d at 580). "Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators; the Beraun–Panez/Hayden factors are simply ones that recur frequently." United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).

Error in admitting statements obtained in violation of Miranda is deemed harmless for purposes of federal habeas review unless the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002).

b.      Analysis

Here, the Fifth DCA applied clearly established Supreme Court precedent. Therefore, the question for this Court is whether that application was unreasonable. In light of the record, a

1  rational jurist could conclude that the state court determination that Petitioner was not in custody
2  at the time of the confession was reasonable.

3  For Miranda purposes, the Supreme Court has determined that suspects were not "in
4  custody" when they were voluntarily approached or accompanied law enforcement officers, with
5  the understanding that they would be questioned.  See California v. Beheler, 463 U.S. 1121, 1125
6  (1982) (per curiam) (holding that defendant was not in custody when he agreed to accompany
7  police to the station to answer questions and was allowed to leave immediately afterward);
8  Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (holding that defendant was not in custody when
9  he came to the station voluntarily and left "without hindrance" after 30 minutes of questioning).
10 The Ninth Circuit has also found that suspects were not in custody where the circumstances
11 included volunteering to answer law officers' questions.  See, e.g., Hayden, 260 F.3d at 1066–67;
12 United States v. Hudgens, 798 F.2d 1234, 1236–37 (9th Cir.1986).

13 In this case, the officers were invited into the home.  They told the grandmother that they
14 could speak to Petitioner wherever is "more convenient for you."  The grandmother stated:
15 "Come on in then" and then told the officer they could go into a bedroom.  According to the
16 transcript of the recording, an unknown voice states, "That's fine," and the appellate court noted
17 after hearing the transcript that it sounded like Petitioner's voice.  The officers then asked
18 Petitioner if they could sit and speak to him and Petitioner said, "Sure."  They again asked if it
19 was okay to speak to him and he replied, "Yeah."  The officers stated they appreciated being
20 invited in.  Petitioner was the first to bring up the victim, after the officers asked if he knew why
21 they were there.  The officers then listened passively to Petitioner's version of events and
22 interjected clarifying questions on occasion.  Petitioner essentially stated that the victim had acted
23 inappropriately with him and had forced herself on him.  After Petitioner recited his version of
24 events, the officers told him that the victim stated he had forced himself on her.  They also
25 indicated they had spoken to Petitioner's uncle, and the uncle had verified that Petitioner had
26 spoken to him about the incidents.  Petitioner then admitted he had intercourse and oral sex with
27 the victim, but that the victim had initiated it.

28 Although the interview was an interrogation, it was also reasonable for the state court to

conclude that Petitioner was not in custody. The officers were invited into Petitioner's bedroom, they did not place him in handcuffs and he voluntarily agreed to speak with them. The interrogation was fairly brief. At no time during the interrogation did the officers indicate that Petitioner would not be free to go about his day after the interrogation concluded. The tone of the officer's questioning was polite and calm, and he showed respect to Petitioner and the grandmother for their time and invitation into their home. The officer matter-of-factly advised Petitioner what they had learned from the victim and the uncle, and Petitioner thereafter confessed. A rational jurist could conclude that the encounter did not become so coercive that a reasonable person in Petitioner's circumstances would not have felt free to end the interrogation and leave. See Hayden, 260 F.3d at 1066 (the defendant's "ability to leave was [not] in any other way restrained," and "the duration of the interviews was [not] excessive[and] undue pressure was [not] exerted"); United States v. Gregory, 891 F.2d 732, 735 (9th Cir.1989) (the defendant "consented to be interviewed . . . and no coercion or force was used"); United States v. Hudgens, 798 F.2d 1234 (9th Cir. 1986) (the defendant voluntarily entered a police car to talk to the police and the agents did not use intimidating or coercive language during the interview). Thus, the state court determination that he was not in custody at the time he confessed was reasonable.

Even if Petitioner's statements had been barred from disclosure to the jury, the result would not have been any different. In addition to this evidence, the Petitioner confessed to a family member and there was also the victim's own allegations. Nothing else in the record would have called these statements into doubt, unless Petitioner himself testified when his confession would have been admissible for impeachment purposes. Oregon v. Elstad, 470 U.S. 298, 307 (1985).

Based on the foregoing, Petitioner fails to demonstrate that the state court's determination that Petitioner's constitutional rights under Miranda were not violated, or that Petitioner suffered no prejudice, was objectively unreasonable. The petition should be denied.

**IV.     RECOMMENDATION**

Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within fourteen (14) court days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **February 11, 2022**                          /s/ *Sheila K. Oberto*
                                                                        UNITED STATES MAGISTRATE JUDGE